[L. A. No. 29499. In Bank. Aug. 28, 1968.]

CHICAGO TITLE INSURANCE COMPANY et al., Plaintiffs and Appellants, v. GREAT WESTERN FINANCIAL CORPORATION et al., Defendants and Respondents.

306

Tremaine & Shenk and Jerrold A. Fadem for Plaintiffs and Appellants.

Hastings & Lasker, Edward Lasker, Milton Davis, McKenna & Fitting, Les Weinstein, Jones & Maupin, James C. Maupin, Milo V. Olson, H. Bradley Jones, Adams, Duque & Hazeltine, Lawrence T. Lydick, and Richard W. Luesebrink for Defendants and Respondents.

Thomas C. Lynch, Attorney General, Wallace Howland, Assistant Attorney General, Robert E. Murphy, Michael I. Spiegel and Harold J. Tomin, Deputy Attorneys General, as Amici Curiae.

SULLIVAN, J.—In this action seeking injunctive relief and damages for unfair trade practices and combinations in restraint of trade, plaintiffs appeal from an order of dismissal entered after the court sustained without leave to amend defendants' several demurrers to plaintiffs' fourth amended complaint and granted defendants' motions to dismiss as to portions of said complaint.

The fourth amended complaint contains 11 counts and 78 paragraphs. Like its predecessors it has fallen to five separate general demurrers, each filed by a group of defendants jointly. Unlike the orders sustaining the previous demurrers, the last demurrers were sustained without leave to amend, the court noting in some instances that counsel for plaintiffs had represented that they could add nothing to the fourth amended complaint. Special demurrers, filed with the general demurrers in all cases, were not ruled upon by the court. Motions to dismiss all or portions of the complaint were variously granted in whole or in part as to defendants designated individually or by groups.[1]

---

[1]The "fourth amended complaint" was amended by plaintiffs prior to attack thereon. As denoted herein, the "fourth amended complaint" is the fourth amended complaint as amended. The general demurrers were sustained and motions to strike granted as to various groups of defendants as parenthetically indicated: (1) Great Western Financial Corporation, Great Western Savings and Loan Association and 25 individual

After decision by the Court of Appeal, Second Appellate District, Division One, which affirmed the order of dismissal, this court on its own motion granted a hearing to give further study to the problems presented. After such study, we have concluded that the Court of Appeal has correctly disposed of the cause. Accordingly the opinion of the Court of Appeal, authored by Justice Fourt and concurred in by Presiding Justice Wood and Justice McCoy, is adopted (with some minor deletions and additional discussions of our own) as and for the opinion of this court. Such portion of the opinion (with appropriate deletions and additions as indicated) is as follows:[2]

 We confine our attention herein to the most recently filed fourth amended complaint since "The court on appeal will not consider the sufficiency of a superseded complaint where the plaintiff has amended it after demurrer sustained." (*Rolley, Inc.* v. *Merle Norman Cosmetics, Inc.,* 129 Cal.App.2d 844, 852 [278 P.2d 63, 282 P.2d 991].) We are, moreover, not concerned with the grounds for special demurrer urged upon the trial court since the general demurrer was

escrow companies referred to herein as Liberty Escrow (general demurrer sustained without leave to amend as to each count alleged, motion to strike complaint granted); (2) Sherwood Escrow Co., and Summit Title Company (general demurrer sustained without leave to amend as to each count alleged upon representations that no further facts could be added, motion to strike granted as to 10 specifications and denied as to 5 specifications); (3) American Title Company (general demurrer sustained without leave to amend as to each count alleged); (4) Security Title Insurance Company and Financial Corp. of America (demurrer of Financial Corp. sustained without leave to amend, general demurrer of Security Title Insurance sustained without leave to amend as to each count alleged upon representations that no further facts can be added, motion to strike granted as to 17 of 78 paragraphs); (5) Lehman Brothers (general demurrer sustained without leave to amend as to each count, motion to strike granted).

[2]Brackets together, in this manner [ ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (*People* v. *Lyons* (1956) 47 Cal.2d 311, 314, fn. 1 [303 P.2d 329]; *Simmons* v. *Civil Service Emp. Ins. Co.* (1962) 57 Cal.2d 381, 383, fn. 1 [19 Cal.Rptr. 662, 369 P.2d 262]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 540, fn. 1 [63 Cal.Rptr. 21, 432 P.2d 717]; *Smith* v. *Anderson* (1967) 67 Cal.2d 635, 637, fn. 1 [63 Cal.Rptr. 391, 433 P.2d 183]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 517, fn. 3 [67 Cal.Rptr. 761, 439 P.2d 889].)

sustained without leave to amend and the complaint was stricken upon appellants' representation that no further facts could be alleged.[3] ██ We shall consider primarily the merits of that decision and, unless at least one cause of action is clearly stated, sustain the order of dismissal. (*Southall* v. *Security Title Ins. etc. Co.*, 112 Cal.App.2d 321, 323 [246 P.2d 74]; *Morris* v. *National Federation of the Blind*, 192 Cal.App. 2d 162, 164 [13 Cal.Rptr. 336].) ██ We are constrained to determine only whether appellants state a cause of action, not whether they might have been able to do so. (*Lemoge Elec.* v. *County of San Mateo*, 46 Cal.2d 659, 664 [297 P.2d 638]; *Levinson* v. *Bank of America*, 126 Cal.App.2d 122, 125 [271 P.2d 632].) ██ The unverified fourth amended complaint, evolved over a period of more than two years of argument through law and motion, is presented to us without showing by brief that appellants could or would be willing to amend further. We conclude that the court did not, by the action

[3]On the record presented we are unable to evaluate the motions to dismiss granted by the trial court as to various defendants. Our examination of the record available persuades us that in major part the motions were granted on the ground that plaintiffs had consistently failed to allege factual matters with the particularity required to sustain a cause of action under the Cartwright Act and other acts on which plaintiffs relied. Accordingly, motions to dismiss all or portions of plaintiffs' fourth amended complaint were granted as to various defendants on grounds which appear to be related to those for sustaining the general demurrers. Although the instant record does not fully advise us of matters identical to those in *Lavine* v. *Jessup* (1957) 48 Cal.2d 611 [311 P.2d 8], plaintiffs assert that a ''duplicate situation'' exists. The following observations from that case are pertinent here: ''This case presents an unusual situation in that the court simultaneously sustained general demurrers without leave to amend and granted motions to strike the complaint as sham and to dismiss the action. The motions were not supported by affidavits setting up any extrinsic matters and obviously were made upon the assumption that the complaint failed to state a cause of action and was merely repetitious of prior complaints which had been ruled insufficient. Defendants thus made their challenge solely on the fact of the pleadings, and it seems clear that the questions presented by the motions were identically the same as those presented by the demurrers, i.e., did the complaint state a cause of action and, if not, could the defects be cured by amendment. The normal method of resolving such issues in favor of a defendant is by ruling upon a demurrer and thereafter rendering a judgment based upon the ruling. It is, of course, unnecessary for the court, in addition, to grant a motion to dismiss. As we have seen, the court subsequently signed and filed a judgment of dismissal which, after reciting that the demurrers had been sustained and the motions had been granted, adjudged that the action be dismissed.'' (48 Cal.2d at p. 614.) As indicated, the court equated the *Lavine* order granting the motion to dismiss with the order sustaining the general demurrer.

[For the foregoing reasons we do not pass upon the merits of the motions to dismiss or the propriety of the orders thereon as raising independent issues.]

taken, abuse its discretion since the pleadings are not susceptible of a construction that might entitle appellants either to injunctive relief or to damages.

Appellants attempt by their complaint to impose upon respondents treble damages for asserted violations of the antitrust, price discrimination and unfair trade practices sections of the Business and Professions Code, and also accuse respondents of the common law tort of interference with advantageous business or contractual relations. The issues as framed by appellants' brief are (1) whether parties allegedly damaged by the wrongdoing of competitors in violation of the subject statutes are entitled to the civil remedies of injunction and/or indemnity, and (2) whether the allegedly injured parties are entitled to damages from certain competitors who, by a conspiracy to provide rebates, intentionally induce a prime customer to transfer its business to the wrongdoers. We must determine, more particularly, whether the superior court has jurisdiction to entertain an action based upon appellants' theories, or any of them, and, if so, whether appellants have stated a cause of action against any of the various named defendants. The latter finding, which is determinative, is in the negative.

The complaint alleges that Lehman Brothers, an investment firm and a partnership, owns a major or controlling interest in Great Western Financial Corporation (hereinafter sometimes referred to as Great Western) and in Financial Corporation of America (hereinafter sometimes referred to as Financial) both of which are financial holding companies. Great Western, in turn, owns Great Western Savings and Loan (hereinafter sometimes referred to as Great Western S&L) and a group of 25 individually named escrow companies hereinafter referred to collectively as Liberty. Financial owns title insurer Security Title Insurance Company (hereinafter sometimes referred to as Security); Financial and Great Western together own American Title Company (sometimes hereinafter referred to as American). All of these interrelated businesses are named as defendants together with two other companies operating under the same, but distinct and independent, ownership known as Summit Title Company (hereinafter sometimes referred to as Summit) and Sherwood Escrow Company (hereinafter sometimes referred to as Sherwood).

The complaint further alleges that appellants are corporations, each qualified to do business in California as an "underwritten title company." The "underwritten title company" (hereinafter sometimes called "title company") is described by code as a "person engaged in the business of preparing title searches, title examinations, certificates or abstracts of title upon the basis of which a title insurer regularly writes title policies . . . ." (Ins. Code, § 12402.) Title insurance, which is a customary incident of practically every California real estate transaction, may be sold either by a title insurer or a title company, and both are regulated by the Insurance Commissioner, must be licensed, meet certain minimum capital requirements, submit to examination and audit, and may have licenses seized or revoked for financial instability or other regulatory infractions. (Ins. Code, §§ 12396 and 12411.) The title insurer is entitled to perform the search and abstract functions, as well as to issue the policy. The title company, which performs only search and abstract work, may engage in the escrow business within statutory limitations. It is specifically contemplated that the title company shall contract to do the preliminary work for a title insurer and then distribute the policy of insurance, the risk of which is underwritten by the title insurer, in return for an appropriate division of fees. (Ins. Code, § 12412.)

Appellant title companies, therefore, compete directly with both Summit and American in Los Angeles County. All three either must do business with or compete with Security, and it is common knowledge that all compete with the long dominant Title Insurance and Trust Company and every other concern qualified to transact title business in this county.

It is appellants' theory that all respondents, including the powerful Lehman Brothers investment banking company, have conspired under the impetus of common interest to violate statutory prohibitions and intentionally interfere with appellants' business to their financial damage. Appellants contend that by virtue of this combination respondents, all and variously, have interfered with their business relationships, violated the California law of antitrust and unfair trade practices, and the Insurance Code. In appellants' words, they charge that defendants "conspired to pay an illegal rebate to lure away customers of the Plaintiffs, and to boycott the Plaintiffs, along with a battery of other acts forbidden by statute." It is the thrust of these allegations that

the acts of the various respondents constitute a fraud on appellants which justifies and, indeed, compels the piercing of corporate veils to disclose an identity of interests between the Lehman-owned companies on the one hand and the Sherwood and Summit shareholders on the other. The facts, however, are sparse and incomplete.

The California law of antitrust, commonly known as the Cartwright Act (Bus. & Prof. Code, §§ 16700-16800) is patterned upon the federal Sherman Act and both have their roots in the common law; hence federal cases interpreting the Sherman Act are applicable with respect to the Cartwright Act. (*Milton* v. *Hudson Sales Corp.*, 152 Cal.App.2d 418 [313 P.2d 936]; *Rolley, Inc.* v. *Merle Norman Cosmetics, Inc., supra*, 129 Cal.App.2d 844.) In 1961 California incorporated in essence also section 3 of that federal legislation known as the Clayton Act (Bus. & Prof. Code, § 16727) which goes beyond common law and the Sherman Act to inhibit trade restraints at their inception, and federal interpretations thereof are similarly persuasive. (*Milton* v. *Hudson Sales Corp., supra.*) We are persuaded by California and federal authorities that appellants' vague and conclusionary pleadings fail to allege facts which might reasonably be construed to reveal a wrongful combination.

Indeed, as to Lehman Brothers, the only ultimate facts alleged are that Lehman Brothers is a partnership, that it owns stock in Great Western and Financial and that at times it has had two or more directors concurrently on the boards of Great Western and Financial, respectively. Thus, Lehman Brothers stands at the investment apex of a pyramid of control which can be reached only by means of factual allegations of conduct on the part of related defendants from which a conspiracy or combination with the intent to jeopardize appellants' business may be inferred. The same analysis applies to Great Western and Financial in their passive administrative role as holding companies, Great Western S & L as a lender relatively remote from the scene, and even Security which, as title insurer, merely issues title policies which constitute the subject matter of appellants' claims.

The corporate interrelationship alleged is not a wrong per se. "Within the present Sherman Act there is no place for a doctrine of intra-enterprise conspiracy. No logical stopping point exists short of giving a prosecutor carte blanche to attack virtually all multicorporate enterprises." (Mc-

Quade, *Conspiracy, Multicorporate Enterprises, and Section 1 of the Sherman Act, 1955,* 41 Va.L.Rev. 183, 216.) There is substantial justification for intercorporate divisions and affilated corporations to do business with one another so long as their very corporate existence and structure do not violate the antitrust laws per se (*United States* v. *Yellow Cab Co.,* 338 U.S. 338 [94 L.Ed. 150, 70 S.Ct. 177]; *United States* v. *Columbia Steel Co.,* 334 U.S. 495, 523, 527 [92 L.Ed. 1533, 1551, 1554, 68 S.Ct. 1107].) Since the mere existence of the Lehman power complex is not the evil under attack, nor its proper subject, we must require that appellants allege [ ] [the specific facts] constituting unfair competition or a conspiracy to engage in such unfair practices and the [ ] nature of the damages inflicted.

■ "The gist of an action charging civil conspiracy is not the conspiracy but the damages suffered. [Citations.] It is the long established rule that a conspiracy, in and of itself, however atrocious, does not give rise to a cause of action unless a civil wrong has been committed resulting in damage. [Citations.] . . . ■ The advantage to the pleader in charging a conspiracy is to implicate all participating in the common design and thus fasten liability on him who agreed to the plan to commit the wrong as well as on him who actually carried it out. [Citations.] ■ The conspiracy 'may be inferred from the nature of the acts done, the relations of the parties, the interests of the alleged conspirators, and other circumstances.' [Citations.]

■ "To state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts. [Citations.]" (*Wise* v. *Southern Pac. Co.,* 223 Cal.App.2d 50, 64-65 [35 Cal.Rptr. 652].) General allegations of agreement have been held sufficient (*Farr* v. *Bramblett,* 132 Cal.App.2d 36, 47 [281 P.2d 372]), and the conspiracy averment has even been held unnecessary, providing the unlawful acts or civil wrongs are otherwise sufficiently alleged. (*Hege* v. *Worthington, Park & Worthington,* 209 Cal.App.2d 670, 678 [26 Cal. Rptr. 132].) ■ Significantly, however, "[t]he activities condemned by the anti-trust law are contracts, combinations, or conspiracies in restraint of . . . trade or commerce. Such contracts, combinations or conspiracies in restraint of . . . trade or commerce cannot be alleged generally in the words of

the statute but the facts must be set forth which indicate the existence of such contracts, combinations or conspiracies.'' (*Westor Theatres* v. *Warner Bros. Pictures, Inc.*, 41 F.Supp. 757, 762.) [General allegations of a conspiracy, without a statement of the facts constituting the conspiracy, its object and accomplishment in the restraint of trade in civil actions are held by the federal courts to be but allegations of legal conclusions, insufficient to constitute a cause of action under the federal statutes. (*Nelson Radio & Supply Co.* v. *Motorola, Inc.* (1952) 200 F.2d 911, 913, 914; *Floyd* v. *Gage* (1951) 192 F.2d 137, 138-139; *Feddersen Motors* v. *Ward* (1950) 180 F.2d 519, 522; *Beegle* v. *Thomson* (1943) 138 F.2d 875, 880; *Black & Yates* v. *Mahogany Assn.* (1941) 129 F.2d 227, 231-232 [148 A.L.R. 841]; *Encore Stores, Inc.* v. *May Dept. Stores Co.* (1958) 164 F.Supp. 82, 84-85; *Leonard* v. *Socony-Vacuum Oil Co.* (1942) 42 F.Supp. 369, 370; *Bader* v. *Zurich General Acc. & Liab. Ins. Co.* (1952) 12 F.R.D. 437, 438-439; 1 Toulmin, Anti-trust Laws (1949), § 2019, p. 850; 1968 Supplement, § 20.7, pp. 42, 43, 44.)]

Appellants themselves concede that they have not alleged facts but contend by reference to Business and Professions Code, section 16756[4] and a criminal decision (*People* v. *Sacramento Butchers' etc. Assn.*, 12 Cal.App. 471, 481 [107 P. 712]), that general allegations of statutory violations are sufficient. The California and federal authorities, however, are contrary where plaintiffs base a civil action for damages upon antitrust legislation. ''While, in a criminal prosecution against persons for maintaining a trust or combination in restraint of commerce or trade, the gist of the offense is in the formation and maintenance of such trust or combination, and the fact of the existence of the combination for the purpose of doing some prohibited act is all that need be proved to support and sustain the charge, yet, in a civil action for damages based upon our anti-trust statute, it is incumbent upon the complaining party, not only to allege and prove the existence of an unlawful trust or combination but also to allege and

[4The following footnote appears in the opinion of the Court of Appeal as footnote No. 1.] Section 16756 of the Business and Professions Code provides as follows:

''[ ] Statements declared sufficient. In any indictment, information or complaint for any offense named in this chapter, it is sufficient to state the purpose or effects of the trust or combination, and that the accused is a member of, acted with, or in pursuance of it, or aided or assisted in carrying out its purposes, without giving its name or description, or how, when and where it was created.''

prove that his business or property has been injured by the very fact of the existence and prosecution of such unlawful trust or combination." (*Munter* v. *Eastman Kodak Co.*, 28 Cal.App. 660, 664-665 [153 P. 737].) General allegations of the existence and purpose of the conspiracy are insufficient and appellants must allege specific overt acts in furtherance thereof. "Conceding the formation of a conspiracy is charged, having for its object a common design and purpose, still we find no statement in the bill as to any specific overt acts done by defendants in pursuance of that design and purpose." (*Davitt* v. *American Bakers' Union*, 124 Cal. 99, 101 [56 P. 775].)

Since the conspiracy allegations are insufficient in and of themselves, we turn to the purported averments of specific acts contained in the complaint and find them similarly lacking. The first count is directed primarily against Summit and Sherwood (hereinafter sometimes referred to as the Sherwood group), but the opening paragraphs allege appellants' corporate existence, Lehman Brothers' ownership of certain respondents and the conspiracy of those defendants to carry out the acts therein described for the purpose of unlawfully restraining trade and destroying competitors. There follow allegations that title insurance policies are customarily procured to insure buyer or lender upon the "transfer and encumbrancing" of real property; that title insurance business in Los Angeles County originates primarily with lenders or buyers of real property and those who perform escrow services; that Liberty is first and Sherwood second in volume of title activity generated by independent escrow companies; and that "[a]ll title companies and title insurance companies . . . compete for title insurance orders from lenders and escrow companies in Los Angeles County." Appellants then aver further that after American "approached" Sherwood, its stockholders incorporated Summit and competition has been lessened because all of Sherwood's title insurance business now goes to Summit; that Security furnishes Summit "all search data needed to insure title" and that Summit issues only Security title policies; that Summit pays one-half the posted rates for such policies to Security but charges Sherwood and its customers the full rates; that Summit performs no substantial function in the issuance of title policies and was created to " 'mask' the illegality of the acts herein described." Finally, it is alleged that all the above was

accomplished "with the intent and with the result of interfering with [appellants'] business relationship with Sherwood," that actual damages resulted, and that Security and American currently seek others "with whom to extend the scope of the kinds of activity described herein" which will further injure appellants so that "the remedy at law will thereby be inadequate." The second count merely incorporates the first and alleges that appellants used to receive most of Sherwood's business but that now it all goes to Summit "which issues only Security's policies." The gravamen of these two counts is that Sherwood formed Summit at the instance of American in order to divert to Summit and Security business which formerly went to appellants.

Each of these counts fails to state a cause of action for interference with contractual relationships because there is no allegation alleged that appellants had a contract with anyone which was breached as a result of the activities of defendants or any of them. (*Allen* v. *Powell,* 248 Cal.App.2d 502, 505-506 [56 Cal.Rptr. 715].)

Appellants similarly fail in either count to state an action for interference with prospective business advantage which will lie on common law principles where the right to pursue a lawful business is intentionally interfered with either by unlawful means, or by means otherwise lawful when there is lack of sufficient justification (*Willis* v. *Santa Ana etc. Hospital Assn.,* 58 Cal.2d 806 [26 Cal.Rptr. 640, 376 P.2d 568]), but only if it appears that the business advantage would otherwise have been realized. (*Perati* v. *Atkinson,* 213 Cal.App.2d 472 [28 Cal.Rptr. 898].) ▮ One with a financial interest in the business of another is privileged however, so long as he does not employ improper means but acts merely to protect his financial interest or promote the other's welfare, to induce the other not to enter a business relationship with a third party. (Rest., Torts, §§ 769, 770, 771.) The conduct of Sherwood and Summit is patently justified.

Appellants compete with Summit; Sherwood which owns Summit naturally sends it business there. Summit buys policies from Security and since appellants are not title insurers the business Security receives in this manner presumably does them no damage. ▮ We reiterate that the owners of a corporate escrow company, such as Sherwood, are authorized by statute to incorporate a separate title company which may then receive from the title insurer with which it does business

a portion of the posted premium in exchange for its search and abstract services. (Ins. Code, § 12396 et seq.)

While it is difficult to isolate from the complaint the specific elements of any given legal action and virtually impossible to determine from each count the nature of the purported cause of action, a second category of circumstances is described in count eight. The gist of this count is that Great Western Financial has prevailed upon Great Western Savings & Loan and the Liberty escrow companies to send their title business to American, which buys policies from Security, and this has damaged appellants. This count realleges the Lehman ownership and control of various defendants, the existence of their conspiracy, and the nature of the title insurance business in Los Angeles County. Thereafter, the complaint alleges generally that savings and loan associations are substantial sources of title business resulting from purchase money loans, refinancing, and the financing of their direct sales of real estate; that buyers of real property frequently select the title company before they know who their lender will be; that when Great Western makes purchase money loans it refuses appellants' policies and favors Security or American; that for this reason escrow officers, when uncertain as to who the lender ultimately may be, are reluctant to deal with appellants; that escrow officers influence buyers who have no preferences; that the Liberty escrow companies, which formerly requested title policies from appellants, now conspire with Great Western to refuse to deal with appellants; that these companies instead divert business to American; that as a result, only in exceptional cases when the buyer demands appellants' services and the loan is not by Great Western, do appellants receive this business; and that Great Western prohibits the use of appellants' policies when it refinances or engages in direct sales of real estate. Count eight further alleges that "competition within Los Angeles County has thereby been substantially reduced"; that "refusal to accept the policies of . . . [appellants] constitutes a boycott," that "this was done" with the intent and result of interfering with appellants' business relationship with Liberty, and this "concerted refusal" violates Business and Professions Code section 17046. Count nine incorporates all allegations of counts one and eight and further alleges that "until the acts of Financial" appellants received Liberty's title business which now goes to Security.

Insofar as appellants attempt to state an action against the Lehman-controlled defendants for interference with contract, they fail, by reference to authorities previously cited, because they allege no prior existing contract. The action for interference with prospective business advantage fails because they do not disclose wherein it is wrongful for Great Western, Great Western S&L, or Liberty to send business to American, any more than it is wrongful for Sherwood to purchase policies through Summit, since appellants had no reasonable assurance that their advantageous relations with Liberty would otherwise continue. They relate no facts from which we might find it improper for Summit or American to purchase title policies from Security. Since Great Western and Financial allegedly own various interests in Great Western S&L, Security, American and Liberty, it is merely prudent business practice for the other companies to request title policies from American and Security just as we heretofore established that the common ownership of Sherwood and Summit justifies a similar business practice. (Rest., Torts, §§ 769, 770, 771, and cases cited, *supra.*)

While Security, Summit and American all compete with appellants for title business, only Summit and American compete on precisely the same business plane and, by purchasing Security's title insurance, these companies do not inhibit appellants' access to the market. Appellants fail to join or allege the identity of the title insurer or insurers with whom they do business, and since they do not complain that they have been denied similar privileges or that Security refuses to sell them policies on terms equivalent to those tendered American and Summit, we must assume that appellants are not deprived of a competitive commodity. The only respondents, therefore, who might be accused of directly diverting business from appellants are Sherwood and Liberty, while the other defendants can be involved only by way of conspiracy. Appellants allude to no reasonable basis for assuming they enjoyed any prior right to do business with the customers of these escrow companies. Since the overt acts alleged are inadequate to establish an action for business interference against Sherwood and Liberty, respectively, the conspiracy allegations also fail.

The remaining counts incorporate successively the principal allegations of the first two counts, and final counts ten and eleven incorporate those of counts eight and nine as well.

These miscellaneous counts charge defendants with various allegedly unfair competitive business practices. All except count seven, which deals with unlawful rebates (Ins. Code, § 12404), refer to the Cartwright Act (Bus. & Prof. Code, §§ 16700-16800). Count three charges that Security transmitted to Sherwood through Summit a secret rebate (Bus. & Prof. Code, § 17045). Count four suggests Security and Summit engaged in unreasonably low or discriminatory pricing (Bus. & Prof. Code, §§ 17043 and 17049). Counts five and ten charge defendants, acting through the Sherwood and Great Western groups, respectively, with tying-in contracts which lessen competition and tend to create a monopoly (Bus. & Prof. Code, § 16727). Counts six and eight charge a boycott or concerted refusal to deal with appellants on the parts of the Sherwood and the Great Western groups, respectively (Bus. & Prof. Code, § 17046). Count eleven incorporates the allegations of all prior counts and alleges that thus defendants entered an illegal combination (Bus. & Prof. Code, § 16720) with the intention to (1) restrict commerce, (2) prevent competition in the sale of a commodity, (3) establish prices which prevent free competition in Los Angeles County, and (4) reduce prices to Sherwood by one-half.

The Cartwright Act, as previously mentioned, is similar in spirit and substance to that federal legislation encompassed by the Sherman (15 U.S.C.A. §§ 1-7) and Clayton Acts (15 U.S.C.A. §§ 12-27). Private individuals, businesses or corporations have, in the absence of express statutory authority, no standing to enforce such regulatory statutes. (Cf. *Show Management* v. *Hearst Publishing Co.,* 196 Cal.App.2d 606, 612-616 [16 Cal.Rptr. 731]; *West Coast Poultry Co.* v. *Glasner,* 231 Cal.App.2d 747 [42 Cal.Rptr. 297]; *Hudson* v. *Craft,* 33 Cal.2d 654 [204 P.2d 1, 7 A.L.R.2d 696].) The Cartwright Act however follows federal policy which expressly contemplates private civil litigation based upon statutes regulating antitrust and unfair trade practices, including illegitimate pricing practices. (Bus. & Prof. Code, §§ 17040-17051.)

These statutes and the common law which once constituted the "protection of the public against combinations in restraint of the insurance trade" (*Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 45 [172 P.2d 867]) are now expressly superseded and contravened by the specific provisions of the Insurance Code. Counts three (secret rebate), four (discriminatory pricing) and seven (unlawful rebate)

clearly concern the regulation of rates charged by title insurers and title companies, and rate regulation has traditionally commanded administrative expertise applied to controlled industries. (Ins. Code, §§ 12404-12412; *County of Placer* v. *Aetna Cas. etc. Co.,* 50 Cal.2d 182 [323 P.2d 753]; *Division of Labor Law Enforcement* v. *Moroney,* 28 Cal.2d 344 [170 P.2d 3].) ▆ Count three, for instance, is based upon a statute (Bus. & Prof. Code, § 17045) aimed at preventing a distributor from discriminating between customers, but fails to allege facts from which a court might properly infer that the prices charged by Security or Summit differ from customer to customer, and is thus defective. (*Federal Automotive Services* v. *Lane Buick Co.,* 204 Cal.App.2d 689 [22 Cal.Rptr. 603].) ▆ Count four, presumably based on the same facts, charges that the discount constitutes a sale of title insurance below cost which is an infraction only if done ''for the purpose of injuring competitors'' (Bus. & Prof. Code, §§ 17043, 17049), but a court is not the appropriate initial arbiter of factors involved in insurance costs. ▆ Count seven implies that Sherwood (an escrow company) acts as ''agent'' for real property owners with whom title insurers and title companies are prohibited from splitting fees and that because Summit is controlled by identical interests, the receipt of a title policy from Security at a discount constitutes an illegal rebate (Ins. Code, § 12404) to Sherwood. The statutory framework, however, specifically contemplates a division of fees between title insurers and title companies which shall be proper unless the method used constitutes such fee divisions ''illegal.'' (Ins. Code, §§ 12412, 12404.5, 12405.7.) It is not clear from the facts alleged that the discount rendered would or should be considered illegal by the insurance commissioner, or that the practice of extending secret rebates, or engaging in unreasonably low or discriminatory pricing policy is followed by the defendants, or any of them. [ ]

[T]he factual allegations, as illustrated, fail in each instance to support the charge. Just as the earlier counts state facts insufficient to establish proscribed conduct on the parts of the alleged actors and thus cannot reach their purported conspirators, so the final counts charging antitrust infringements fall for similar reasons. [ ]

▆ Appellants contend in counts six and eight that the conduct of the Sherwood and Great Western groups, respec-

tively, infringes Business and Professions Code section 17046. The attempted application of this section to the facts evidences appellants' misinterpretation of the nature of a boycott. The allegation of boycott cannot be supported in this instance because everyone has the unrestricted right to select customers and sources of supply. (Bus. & Prof. Code, § 17042; *A.B.C. Distributing Co.* v. *Distillers Distributing Corp.*, 154 Cal.App.2d 175, 189 [316 P.2d 71].) There is not, and could not be an allegation that it is unreasonable for Sherwood to buy through Summit, or for Great Western Financial to require its subsidiaries in the savings and loan or escrow business to engage the services of the title company in which it likewise has an interest. Not only are vertical distribution agreements in this instance contemplated by the Insurance Code, but "[i]t seems clear to us that vertical integration, as such without more, cannot be held violative of the Sherman Act." (*United States* v. *Columbia Steel Co., supra,* 334 U.S. 495, 525 [92 L.Ed. 1533, 1553, 68 S.Ct. 1107].) Neither do exclusive dealing arrangements constitute boycotts (*Rolley, Inc.* v. *Merle Norman Cosmetics, Inc., supra,* 129 Cal.App.2d 844), which consist, instead, of horizontal alliances between persons at the same level of distribution, who agree not to deal with some third person (*Klor's, Inc.* v. *Broadway-Hale Stores, Inc.,* 359 U.S. 207 [3 L.Ed.2d 741, 79 S.Ct. 705]; *Eastern States etc. Assn.* v. *United States,* 234 U.S. 600 [58 L.Ed. 1490, 34 S.Ct. 951, L.R.A. 1915A 788].) [ ] [No impropriety is alleged in the agreement of Sherwood to purchase from Summit and of Liberty to purchase from American.] An agreement between and among Sherwood and Liberty not to deal with appellants might, under proper circumstances, constitute a boycott, but there is no allegation that these parties or their superior interests agreed or accomplished by threat or violent means their alleged aim to coerce third parties not to deal with appellants. [(Bus. & Prof. Code, § 17046.)] [ ] Once again, the claimed statutory infraction is vague, conclusionary, and factually unsupported by the complaint.

[We have heretofore concluded that because plaintiffs' vague and conclusionary pleadings fail to allege sufficient facts, the complaint fails to state a violation of the Cartwright Act based on conduct, including boycotts, prohibited thereunder. (Bus. & Prof. Code, §§ 16720, 16727.)]

While the boycott statute (Bus. & Prof. Code, § 17046) referred to in count eight makes it unlawful to use threats,

intimidation or boycott to effect a violation of the unfair trade practices laws, the complaint implies rather that respondents used the boycott to effect a restraint of trade (Bus. & Prof. Code, § 16727). Counts five and ten allege that the facts of count one as to the activities of Sherwood and Summit, and of count eight with respect to the Lehman enterprises, respectively, constitute exclusive sales agreements and "tying-in" contracts which "may . . . substantially lessen competition or tend to create a monopoly. . . . (Bus. & Prof. Code, § 16727.)

Again the allegations are inadequate. The term "tying-in" contract has been applied judicially to those agreements whereby the seller or lessor of patented, or unpatented, equipment requires the purchaser or lessee to use only those unpatented accessory items manufactured or sold by the seller or lessor. (*International Salt Co.* v. *United States,* 332 U.S. 392 [92 L.Ed. 20, 68 S.Ct. 12]; *International Business Machines Corp.* v. *United States,* 298 U.S. 131 [80 L.Ed. 1085, 56 S.Ct. 701].)

██ "[A] tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." (*Northern Pac. Ry. Co.* v. *United States,* 356 U.S. 1, 5-6 [2 L.Ed.2d 545, 549-550, 78 S.Ct. 514].) A lending institution, however, has been traditionally entitled to require for its protection and as a condition of making the loan, a specific type of title policy from a particular source; the debtor-purchaser is free to obtain a policy to protect his equity from whatever source he chooses, though most frequently he relies upon the lender's policy.

██ Appellants fail to define the market by subject matter, total volume, proportion controlled by defendants, availability to appellants of the subject matter or a competing subject matter, and availability to the public of the subject matter or a competing subject matter. (*Apex Hosiery Co.* v. *Leader,* 310 U.S. 469 [84 L.Ed. 1311, 60 S.Ct. 982, 128 A.L.R. 1044]; *Rolley, Inc.* v. *Merle Norman Cosmetics, Inc., supra,* 129 Cal.App.2d 844, 851-852.) They fail to state facts from which it may be inferred that respondents control the title insurance market in Los Angeles County and can substantially exclude appellants from such market or limit the availability of title insurance to the public, and these matters are

essential to antitrust actions in which either monopoly or the attempt to create a monopoly in restraint of trade is charged. (*A.B.C. Distributing Co.* v. *Distillers Distributing Corp., supra,* 154 Cal.App.2d 175, 180, 190; *Milton* v. *Hudson Sales Corp., supra,* 152 Cal.App.2d 418, 443-444; *Rolley. Inc.,* v. *Merle Norman Cosmetics, Inc., supra,* 129 Cal.App.2d 844.) We find no allegation that Security enjoys such a dominant position in the title industry that it can or does tie the sale of any other commodity to the policies it sells. Presumably this the appellants cannot allege in view of the dominant position long occupied by Title Insurance and Trust Company in Los Angeles County, of which we may take judicial notice. Hence, there can be no unlawful tying agreement, and appellants do not allege that their rights to purchase freely on the open market have been thus infringed.

Finally, count eleven in grand finale incorporates all prior counts and concludes that by reason of everything so stated respondents have formed a trust or combination in restraint of trade (Bus. & Prof. Code, § 16720), again a mere legal conclusion drawn from generalities. (*Abouaf* v. *J. D. & A. B. Spreckels Co.,* 26 F.Supp. 830, 834; *Glenn Coal Co.* v. *Dickinson Fuel Co.,* 72 F.2d 885, 887.) Where complainants are unsuccessful in establishing an action for conduct which "may . . . tend to create a monopoly" (Bus. & Prof. Code, § 16727), they are *a fortiori* doomed to failure with respect to the full blown conduct they must allege to come within acts proscribed by statutes patterned on the Sherman Act (Bus. & Prof. Code, § 16720); *Tampa Elec. Co.* v. *Nashville Coal Co.,* 365 U.S. 320, 335 [5 L.Ed.2d 580, 591, 81 S.Ct. 623]; cf. *Rolley, Inc.* v. *Merle Norman Cosmetics, Inc., supra,* 129 Cal. App.2d 844.) There is a dangerous vice inherent in the complaint with which we are herein presented because it is ambiguous and investigatory in nature. Respondents are entitled to know [ ] what acts constitute the alleged violations so that the time and expense involved in conducting an investigation and pursuing discovery may be reasonably limited, for the complaint might otherwise be construed as a blanket license to indulge in interrogatories, depositions, and motions to produce ad infinitum, ad nauseam. (*Beegle* v. *Thompson, supra,* 138 F.2d 875; *Leonard* v. *Socony-Vacuum Oil Co., supra,* 42 F.Supp. 369; See: Yankwich, Leon R., "*Short Cuts*" *in Long Cases,* 13 F.R.D. 41, and Committee Report of the Judicial Conference of the United States, "Procedure in Anti-

trust and Other Protracted Cases'' 13 F.R.D. 62.) This count which fails because of inadequate allegations of monopoly or monopoly power and lack of factual allegations of specific conduct in furtherance of a conspiracy or combination, is therefore insufficient as to each of the defendants charged with conspiracy.

Appellants, by their conduct, demonstrate that they are unable or unwilling to amend to cure the defects specified in various special demurrers to their complaint which were sustained on similar grounds designated by two different trial judges. These include the ground that certain counts unite and fail to separately state several causes of action, that certain counts improperly unite several causes of action, and that each count is ambiguous, unintelligible and uncertain. We find each of these grounds well taken. Leave to amend further is properly denied when a plaintiff fails to amend to correct defects on the basis of which special demurrers to a previous complaint were sustained, or as directed by the court when sustaining such demurrers. (*Aitken* v. *Southwest Finance Corp.*, 131 Cal.App. 95, 106 [20 P.2d 1000] ; *Spencer* v. *Crocker First Nat. Bank*, 86 Cal.App.2d 397, 401 [194 P.2d 775].)

By irresponsible pleading containing unrestrained and unverified allegations, appellants attempt to secure the right by discovery to explore at random and at enormous expense to respondents, several large and important businesses and their relationships with one another, namely, the savings and loan, escrow, title insurance and title businesses. The method used by appellants has been aptly characterized by Judge Kaus as a ''shotgun'' technique where plaintiffs deal solely in broad generalities and otherwise indulge in factual and legal conclusions, unsupported speculation and argumentative allegations. (*Lesperance* v. *North American Aviation, Inc.*, 217 Cal.App. 2d 336, 342-343 [31 Cal.Rptr. 873].) ''A demurrer does not . . . admit contentions, deductions or conclusions of facts or law which may be alleged in a complaint [citation].'' (*Marin* v. *Jacuzzi*, 224 Cal.App.2d 549, 552 [36 Cal.Rptr. 880].) As earlier signified by Judge Kaus, where the complaint is thus devoid of facts to support its legal conclusions of conspiracy ''it is just as possible that the difficulty of the pleader arises from the fact that the events and relationships which would give rise to a cause of action never took place, as it is that they did take place but that the defendants did not tell plaintiffs about them'' and the conclusion is inescapable

that "[t]he failure to make a good pleading probably arises in a lack of facts rather than in the fault of the pleader." (*Dukes* v. *Kellogg,* 127 Cal. 563, 565 [60 P. 44].)

"Abuse of discretion [by the trial court] is not shown where it is not indicated as to the manner in which it is proposed to amend nor the nature of the proposed amendment. [Citations.] Neither before the trial court nor before this court has plaintiff indicated the nature of a proposed amendment or the manner in which he would amend his complaint. Plaintiff has therefore failed to establish reversible error in the dismissal of the action. . . ." (*Starbird* v. *Lane,* 203 Cal.App.2d 247, 262 [21 Cal.Rptr. 280].) [ ]

The order is affirmed.

Traynor, C. J., McComb, J., Peters, J., Tobriner, J., and Burke, J., concurred.

MOSK, J.—I dissent.

This case should not be decided on the pleadings; plaintiffs are entitled to a day in court in which to prove, if they can, the economic loss they allegedly suffered and continue to suffer as a result of the purported illegal acts of defendants. The court below, and now a majority of this court, impose upon plaintiffs a pleading straitjacket neither compelled by precedent nor consistent with the design of antitrust statutes.

After two demurrers were sustained, plaintiffs filed a third amended complaint in which they comprehensively described the conduct of the defendants asserted to be unlawful. The complaint in essence charged that all of the activities were part of a single combination designed to injure plaintiffs. The trial court again sustained a demurrer, on the special ground that several causes of action were not separately stated.

Attempting to comply with the trial court's directions, plaintiffs divided their fourth amended complaint into 11 counts, and it is those counts which the trial court and the Court of Appeal dissected on general demurrer with the deft touch of a scalpel ordinarily reserved for a special demurrer or motion to strike. An order of dismissal was subsequently entered, and this appeal follows.

It is elementary that if a complaint can withstand a general demurrer, an order sustaining demurrers without leave to amend is erroneous even though special demurrers should be sustained and motions to strike granted. (*Wennerholm* v.

*Stanford University School of Medicine* (1942) 20 Cal.2d 713, 718-719 [128 P.2d 522, 141 A.L.R. 1358].) I am convinced the complaint here states a cause of action under the Cartwright Act and that regardless of infirmities in form revealed by the special demurrers, the general demurrer should not have been sustained without leave to amend. Even if all others failed, counts 1, 5, 10 and 11 effectively charge violations of the Cartwright Act when the complaint is viewed pursuant to the rules of liberal pleading permissible thereunder.

The Cartwright Act, generally proscribing combinations in restraint of trade, is patterned after the federal Sherman and Clayton Acts, and California decisions consistently rely on federal decisions in interpreting our act. (*People* v. *Building Maintenance etc. Assn.* (1953) 41 Cal.2d 719, 724 et seq. [264 P.2d 31] ; *Speegle* v. *Board of Fire Underwriters* (1946) 29 Cal.2d 34, 43 et seq. [172 P.2d 867] ; *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) 238 Cal.App.2d 225, 232 [47 Cal.Rptr. 570] ; *People* v. *Inlaid Bid Depository* (1965) 233 Cal.App.2d 851, 860-861 [44 Cal.Rptr. 206] ; *Shasta Douglas Oil Co.* v. *Work* (1963) 212 Cal.App.2d 618, 625 [28 Cal.Rptr. 190].) Although Cartwright is couched in terms of prohibited conduct with criminal sanctions and the Attorney General is charged with its public enforcement, private enforcement is also authorized, deemed in the public interest, and encouraged. (*Radovich* v. *National Football League* (1957) 352 U.S. 445, 453-454 [1 L.Ed.2d 456, 462-463, 77 S.Ct. 390] ; *Lawlor* v. *National Screen Service* (1955) 349 U.S. 322, 329 [99 L.Ed. 1122, 1128, 75 S.Ct. 865] ; *Mach-Tronics. Inc.* v. *Zirpoli* (9th Cir. 1963) 316 F.2d 820, 828.) Thus in *Bruce's Juices* v. *American Can Co.* (1947) 330 U.S. 743, 751-752 [91 L.Ed. 1219, 1225-1226, 67 S.Ct. 1015]. Justice Jackson emphasized the desirability of private enforcement of antitrust laws: ''Where the interests of individuals or private groups or those who bear a special relation to the prohibition of a statute are identical with the public interest in having a statute enforced, it is not uncommon to permit them to invoke sanctions. This stimulates one set of private interest to combat transgressions by another without resort to governmental enforcement agencies. Such remedies have the advantage of putting back of such statutes a strong and reliable motive for enforcement which relieves the Government of cost of enforcement. . . . It is clear Congress intended to use private self-interest as a means of enforcement and to arm injured persons with pri-

vate means to retribution when it gave to any injured party a private cause of action in which his damages are to be made good threefold, with costs of suit and reasonable attorney's fees." As in the federal acts, the California statute provides that a private party injured because of an antitrust violation may recover treble damages and attorney fees, as well as costs. (Bus. & Prof. Code, § 16750, subd. (a).)

Pleading poses no unique problems under the Cartwright Act. By its express provisions, violations under the act may.be pleaded in general terms: ''In any indictment, information *or complaint* for any offense named in this chapter, it *is* sufficient to state the purpose or effects of the trust or combination, and that the accused is a member of, acted with, or in pursuance of it, or aided or assisted in carrying out its purposes, without giving its name or description, or how, when and where it was created." (Italics added.) (Bus. & Prof. Code, § 16756.) In reviewing the sufficiency of an information in *People* v. *Sacramento Butchers' etc. Assn.* (1910) 12 Cal.App. 471, 484-485 [107 P. 712], the court said: ''While in no manner vitiating the information, there was, in our opinion, no real necessity for alleging the acts constituting the actual accomplishment of the object or purpose of the combination or conspiracy. They constitute mere probative facts, since the gist of the crime of conspiracy is in its formation for an unlawful purpose, . . . Therefore, the acts constituting the actual execution of the purpose of a criminal conspiracy are only evidence of the existence of such conspiracy, which is the ultimate fact to be. proved in order to establish the wrongful act against which the statute inveighs." (See also *United States* v *Patten* (1913) 226 U.S. 525 [57 L.Ed. 333, 33 S.Ct. 141, 44 L.R.A. N.S. 325].)

Although the code section does not qualify the word ''complaint'' as civil or criminal, defendants urge that the provisions for general pleading relate only to criminal charges and that one seeking treble damages in a civil· action must allege with specificity the particular conduct constituting the claimed conspiracy in restraint of trade, the overt acts thereunder, and the precise nature of the. damages resulting therefrom. Thus, it is asserted, the instant complaint fails to allege a violation of the Cartwright Act because it avers only generally that the defendants conspired with the intent of unlawfully restraining trade and competition, without describing with particularity or clarity facts which are

descriptive of the claimed times, places, and other circumstances of the formation of the alleged illegal combinations, the role played therein by each defendant, or the specific overt acts committed in furtherance thereof.

I find no justification to hold that a private plaintiff, in seeking to assert an antitrust violation, must plead his cause with greater particularity than the state in an enforcement action. Although some earlier federal decisions held to a contrary view (*Beegle* v. *Thomson* (7th Cir. 1943) 138 F.2d 875, 881; *Leonard* v. *Socony-Vacuum Oil Co.* (W.D. Wis. 1942) 42 F.Supp. 369, 370-371; *Westor Theatres* v. *Warner Bros. Pictures* (D.N.J. 1941) 41 F.Supp. 757, 762), the more recent and prevailing federal cases hold that a private plaintiff need state no more than ultimate facts which, if true, would entitle him to recovery. (*Niagara of Buffalo, Inc.* v. *Niagara Mfg. & Distributing Corp.* (2d Cir. 1958) 262 F.2d 106, 107; *New Home Appliance Center, Inc.* v. *Thompson* (10th Cir. 1957) 250 F.2d 881, 883-884.) The question was considered in detail in *Nagler* v. *Admiral Corp.* (2d Cir. 1957) 248 F.2d 319. In rejecting the contention that an antitrust complaint must set out a detailed factual exposition, the court stated (at p. 325): "In testing whether this is a sufficient statement of claim upon which to base a lawsuit, we ought practically to consider the alternatives, both what can be expected and asked of antitrust plaintiffs and what can be accomplished by compulsive orders. Here seems to be the rock upon which attempts below to achieve more particularized pleading have definitely foundered; for the judges' directions double the bulk without increasing enlightenment, while they delay the cause and exhaust the time of several judges. . . ."

There is no basis for distinguishing between the nature of the prohibited conduct on the ground that the act is enforced in civil rather than criminal proceedings. The *Sacramento Butchers* case (1910) *supra,* 12 Cal.App. 471, has been relied upon in support of the proposition in civil cases that "The gravamen of the offense against the Cartwright Act is the *mere formation of the combination or conspiracy for the unlawful purpose of restraining trade. . . .*" (Italics in original.) (*People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) *supra,* 238 Cal.App.2d 225, 238; cf. *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542* (1958) 163 Cal.App. 2d 771, 783-784 [330 P.2d 53].) It is clear that the precise nature of the combination or conspiracy need not be alleged

or ultimately proved with particularity. ''It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.'' (*American Tobacco Co.* v. *United States* (1946) 328 U.S. 781, 809 [90 L.Ed. 1575, 1594, 66 S.Ct. 1125] ; see also *Eastern States Lbr. Assn.* v. *United States* (1914) 234 U.S. 600, 614 [58 L.Ed. 1490, 1500, 34 S.Ct. 951, L.R.A. 1915A 788].) Federal decisions, like the state cases of *Santa Clara Valley* and *Alfred M. Lewis, Inc.*, make it abundantly clear that the conspiracy alone constitutes the actionable conduct. (*United States* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 225, fn. 59 [84 L.Ed. 1129, 1168-1170, 60 S.Ct. 811].)

Defendant's contention that the complaint is insufficient because it fails to allege public injury resulting from the alleged restraints is not meritorious. ''Congress [has] determined its own criteria of public harm and it [is] not for the courts to decide whether in an individual case injury [has] actually occurred. . . . Congress having thus prescribed the criteria of the prohibitions, the courts may not expand them. Therefore, to state a claim upon which relief can be granted . . . allegations adequate to show a violation and, in a private treble damage action, that plaintiff was damaged thereby are all the law requires.'' (*Radiant Burners* v. *Peoples Gas Co.* (1961) 364 U.S. 656, 660 [5 L.Ed.2d 358, 361, 81 S.Ct. 365].) A contention similar to that of defendants here was rejected in *Klor's* v. *Broadway Hale Stores* (1959) 359 U.S. 207, 213-214 [3 L.Ed.2d 741, 745-746, 79 S.Ct. 705], as follows: ''Monopoly can as surely thrive by the elimination of such small businessmen, one at the time, as it can be driving them out in large groups. In recognition of this fact the Sherman Act has consistently been read to forbid all contracts and combinations which 'tend to create a monopoly,' whether 'the tendency is a creeping one' or 'one that proceeds at full gallop.' *International Salt Co.* v *United States*, 332 U.S. 392, 396 [92 L.Ed. 20, 26, 68 S.Ct. 12].'' (See also *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) *supra*, 238 Cal.App.2d 225, 235 ; *People* v. *Inland Bid Depository* (1965) *supra*, 233 Cal.App.2d 851, 860.)

In requiring specificity of allegations, the majority are apparently adapting classic conspiracy and fraud concepts to the Cartwright Act. In so doing, they improvidently muddy

the antitrust waters. While section 1 of the Sherman Act outlaws every "contract, combination in the form of trust or otherwise, or conspiracy" in restraint of trade (15 U.S.C., § 1), the Cartwright Act makes no reference whatever to conspiracy. It outlaws, rather, every "trust" (Bus. & Prof. Code, § 16726); and the term "trust" is defined as "a combination of capital, skill or acts by two or more persons" for a number of specified purposes deemed by the Legislature to be deterimental to the economy of the state (Bus & Prof. Code, § 16720).

Unstudied use of the term "conspiracy" in numerous Cartwright Act pleadings (see, e.g., *Willis* v. *Santa Ana etc. Hospital Assn.* (1962) 58 Cal.2d 806, 808 [26 Cal.Rptr. 640, 376 P.2d 568]; *People* v. *Santa Clara Valley Bowling etc. Assn.* (1965) *supra*, 238 Cal.App.2d 225, 227) may be the cause of misleading the defendants here and the courts below into insisting upon the pleading elements of an ordinary conspiracy charge in an antitrust complaint. Thus while such cases as *Wise* v. *Southern Pac. Co.* (1963) 223 Cal.App.2d 50, 65 [35 Cal.Rptr. 652], demand not merely a conspiracy but also a "civil wrong producing damage to the plaintiff," the United States Supreme Court has made it abundantly clear that in reality no such requirement exists in the antitrust field: "It is not the form of the combination or the particular means used but the result to be achieved that the [antitrust] statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. . . ." (*American Tobacco Co.* v. *United States* (1946) 328 U.S. 781, 809 [90 L.Ed. 1575, 1594, 66 S.Ct. 1125].)

Such has always been the law of antitrust, in both public and private actions. Justice Day spoke for the Supreme Court to the same effect years ago in what is now the leading case on this question: " 'An act harmless when done by one may become a public wrong when done by many acting in concert, for it then takes on the form of a conspiracy, and may be prohibited or punished if the result be hurtful to the public or to the individual against whom the concerted action is directed.'

"When the retailer goes beyond his personal right, and, conspiring and combining with others of like purpose, seeks to obstruct the free course of interstate trade and commerce . . . he exceeds his lawful rights, and such action brings him and those acting with him within the condemnation of the act of Congress. . . " (*Eastern States Lbr. Assn.* v. *United States* (1914) *supra*, 234 U.S. 600, 614 [58 L.Ed. 1490, 1500].)

Any act, be it legal or illegal, when done pursuant to an agreement or combination the purpose or effect of which is to restrain trade in violation of the statute, is an act upon which relief can be granted to a private plaintiff as well as to a public agency. (*Simpson* v. *Union Oil Co.* (1964) 377 U.S. 13 [12 L.Ed.2d 98, 84 S.Ct. 1051]; *Lessig* v. *Tidewater Oil Co.* (9th Cir. 1964) 327 F.2d 459, 466.)

The distinction which the courts below failed to grasp is that, regardless of any need to allege overt acts in stating a cause of action for conspiracy under other statutes (cf. Pen. Code, §§ 182, 184, 1104), there is no such requirement in alleging an actionable antitrust violation. Fully applicable to a combination violative of the Cartwright Act is this summary of significant characteristics of federal requirements: "And it is likewise well settled that conspiracies under the Sherman Act are not dependent upon an overt act other than the act of conspiring. [Citations.] It is the 'contract, combination . . . or conspiracy in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted action be wholly nascent or abortive on the one hand. or successful on the other. [Citations.] And the amount of interstate or foreign trade involved is not material [citation] since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected. [Citations.] In view of these considerations a conspiracy to fix prices violates § 1 of the Act though no overt act is shown, though it is not established that the conspirators had the means available for accomplishment of their objective, and though the conspiracy embraced but a part of the interstate or foreign commerce in the commodity." (*United States* v. *Socony-Vacuum Oil Co.* (1940) *supra*, 310 U.S. 150, fn. 59, at p. 225 [84 L.Ed. at p. 1169].)

California practice unquestionably conforms to the foregoing rule, as indicated in *Alfred M. Lewis, Inc.* v. *Warehousemen etc. Local No. 542* (1958) *supra*, 163 Cal.App.2d

771, 783-784: "Under the Cartwright Act and similar anti-trust legislation, the combination for a particular purpose constitutes the unlawful act. [Citations.] The prohibited combination comes into being through an agreement of two or more persons for the purpose of restraining trade or preventing competition. Conduct used to effect such an agreement may result in actionable damages or be the subject of an injunction, even though such conduct if not used to effect the agreement would be lawful."

In construing application of the federal Clayton Act, Justice Stone wrote in *Arrow-Hart & Hegeman Co.* v. *Commissioners* (1934) 291 U.S. 587, 607 [78 L.Ed. 1007, 1018, 54 S.Ct. 532] (dissenting opinion), "there must be a balance between the general and the particular. When the courts are faced with interpretation of the particular, administration breaks down and the manifest purpose of the legislature is defeated unless it is recognized that, surrounding granted powers, there must be a penumbra which will give scope for practical operation. In carrying such schemes into operation the fuction of courts is constructive, not destructive, to make them, wherever reasonably possible, effective agencies for law enforcement and not to destroy them."

For the foregoing reasons, and in order to provide an effective means for implementing the state Cartwright Act, neither a private plaintiff nor the state need plead a cause of action thereunder with the particularity required in a conspiracy or fraud action. (*People* v. *Sacramento Butchers' etc. Assn.* (1910) *supra,* 12 Cal.App. 471, 484-485.)

The instant complaint alleges in count 1, and incorporates into all the remaining counts, the following: "Defendants have jointly conspired to and in the execution of the goals of the conspiracy carried out the acts herein set forth with the intent and result of unlawfully restraining trade and competition by preventing [plaintiffs] from selling their title policies, with the intent and result of unlawfully injuring competitors and destroying competition and which constitute unfair methods of competition." While perhaps it could be phrased more artfully, this allegation, under settled rules of liberal construction (*Speegle* v. *Board of Fire Underwriters* (1946) *supra,* 29 Cal.2d 34, 42) sufficiently states the "purpose or effects of the trust or combination," and avers that each defendant "is a member of, acted with, or in pursuance of" the combination. (Bus. & Prof. Code,

§ 16756.) Although the allegation may be conclusionary in nature, the inclusion of such conclusionary matters with ultimate facts is permissible in certain situations *Burks* v. *Poppy Constr. Co.* (1962) 57 Cal.2d 463, 473-474 [20 Cal.Rptr. 609, 370 P.2d 313]).

It thus appears that plaintiffs have stated a cause of action under the Cartwright Act, a cause which has been incorporated into each of the 11 counts. The complaint may be specially demurrable, but it states at least one cause of action beyond the reach of a general demurrer. The sustaining of the general demurrers without leave to amend was therefore error. (*Wennerholm* v. *Stanford University School of Medicine* (1942) *supra*, 20 Cal.2d 713, 718-719; *Eustace* v. *Dechter* (1938) 28 Cal.App.2d 706, 710-711 [83 P.2d 523].)

I would reverse the judgment with directions to the trial court to vacate the orders sustaining the demurrers and granting the motions to strike, to overrule the general demurrers, and to rule on the points presented by the special demurrers and the motions to strike.