[Civ. No. 1785. Fifth Dist. Nov. 21, 1973.]

MAE DEVIDIAN et al., Plaintiffs and Appellants, v.
AUTOMOTIVE SERVICE DEALERS ASSOCIATION et al.,
Defendants and Respondents.

**COUNSEL**

Palley & Schwartz and Robert Z. Walker for Plaintiffs and Appellants.

Philip Keith, and Maxwell Keith, Miles, Sears & Eanni, Carmen A. Eanni, Crossland, Crossland & Caswell and Paul T. Chambers for Defendants and Respondents.

**OPINION**

**THOMPSON, J.*** — Plaintiffs and appellants (hereinafter referred to as "plaintiffs") appeal from a judgment dismissing their cause of action against defendants and respondents (hereinafter referred to as "defendants") after general demurrers filed by two separate sets of defendants were sustained

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

without leave to amend. Motions to strike certain paragraphs of the complaint were also granted.

Plaintiffs' second amended complaint essentially realleges the first count of the first amended complaint and may be summarized as follows:

Defendant Earl Baker and Does 1 to 300 are at some or all times members of defendant Automotive Service Dealers Association (hereinafter referred to as "Association") and as a group are referred to as defendant-members.

Defendant Baker and Does 301 through 1,000 are owners and/or operators of service stations in Fresno or Madera Counties at some time or all times between September 21, 1966, and June 5, 1967, this group being referred to as defendant-owners.

Does 1,001 to 1,100 are gasoline distributors engaged in the business of refining, marketing, distributing or supplying gasoline to defendant-owners at some or all times between September 21, 1966, and June 5, 1967, the group being referred to as defendant-suppliers. (None of this group have apparently been served.)

Plaintiffs bring this action for themselves and on behalf of a class of all persons similarly situated who purchased gasoline in Fresno and Madera Counties between September 21, 1966, and June 5, 1967, from defendant-members, defendant-owners or from other service stations at which the price of gasoline was affected by acts of defendants.

Plaintiffs further alleged that all of the defendants entered into a conspiracy to fix the price of gasoline (two cents above the then prevailing price) at all gasoline stations in Fresno and Madera Counties and outlined methods whereby obedience to such price fixing could be compelled and that in the carrying out of said conspiracy defendants committed overt acts in the furtherance of the conspiracy with intent of intimidating service stations who did not abide by the price fixing. It is alleged that the price of gasoline was raised two cents and the supplier-defendants aided and assisted their codefendants without any specification as to the manner in which this was accomplished.

It is further alleged that in a jury trial defendants Earl V. Baker and Automotive Service Dealers Association were found guilty in a federal court upon essentially the same charges of price fixing as alleged in plaintiffs' complaint.

Damages in the amount of $4,050,000 for losses suffered by members of the class are prayed for, said damages consisting of higher prices for

gasoline paid by the class "than would have been charged had normal competitive conditions prevailed." Statutory damages in the amount of $8,100,000 are also sought, together with attorneys' fees and costs.

■   Since plaintiffs did not seek leave to amend before the trial court (nor do they do so on appeal) and since the defects in pleading, if such they were, were carried over from the first amended complaint we shall consider this case solely upon the premise that plaintiffs have alleged all that is within their power to allege and the judgment herein should be affirmed or reversed upon that premise. *Chicago Title Ins. Co.* v. *Great Western Financial Corp.,* 69 Cal.2d 305, at page 327 [70 Cal.Rptr. 849, 444 P.2d 481].

In addition to the matters pleaded, we believe that the court is required to view the class action herein sought to be stated in the milieu out of which it arises as we shall discuss later.

We are well aware of the recent cases of *Vasquez* v. *Superior Court,* 4 Cal.3d 800 [94 Cal.Rptr. 796, 484 P.2d 964], and *Daar* v. *Yellow Cab Co.,* 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732] and recognize that if the present case bears any substantial similarity to those cases we are bound to reach a similar result in passing upon the pleadings in this case. However, we do not believe that if very substantial dissimilarities exist the same result must follow if to do so requires us to reach an unjust, if not absurd, result.

The first enormous difference we would note that unlike the *Vasquez* and *Daar* cases, *supra,* the present case essentially involves a suit by a very large class, not less than 250,000 members as we shall point out, against a class, owners and operators of service stations numbering in the hundreds. In the *Daar* case we have a large number of members in the plaintiffs' class but we have only one defendant. In the *Vasquez* case we have not more than 200 plaintiff members and only three defendants. In the *Daar* case we have but a simple computation to make, the amount of the over-charge based upon the difference between what the defendant was permitted to charge the users of its taxis and the charge fixed by its franchise. In the instant case we have price differentials which are not only difficult of ascertainment but subject to the frequent fluctuations so universally common to the gasoline industry. In the *Vasquez* case we have not only a relatively few plaintiffs but substantial damages to each amounting to in excess of $1,000. In the present case we have at least a quarter million of plaintiffs' purchasers of gasoline whose average purchase of gasoline in a single transaction would not exceed 15 gallons with a maximum damage potential to the plaintiff on such a transaction of 30 cents. In the *Vasquez*

case we have written contracts and other memoranda to substantiate individual transactions. In our case, although we have many purchases covered by credit cards, we would also have many thousands of transactions conducted in cash without a shred of written substantiation. We do not believe that it is at all likely that cash purchasers could remember from which stations they had purchased their gasoline, let alone remembering whether it was purchased from a service station owner who was part of the conspiracy or from one who was not.

We could greatly expand this list of dissimilarities but no purpose would be served thereby. Perhaps an overview of what would be required should the instant case be brought to trial would be helpful. To do so we shall make certain assumptions which are either deducible from the pleadings, from memoranda in the files, from discovery proceedings available to us in the files, or from "generalized knowledge that are so universally known that they cannot reasonably be the subject of dispute." (Evid. Code, § 451, subd. (f).)

From census figures and other data we discover that as of September 21, 1966, the population of Fresno and Madera Counties was approximately 465,000. From similar sources we discover that the ratio of automobiles to people in California is three cars for every five persons. Applying this ratio we determine that there were approximately 275,000 automobiles in Fresno and Madera Counties. We would further note that these counties are at the back door of heavily patronized resort areas which attract great numbers of tourists. A very large percentage of the visitors to Yosemite Valley, which annually numbers about a million persons, reach that national park by traversing these counties. Their purchases of gasoline within these counties must be very substantial.

For the purpose of illustrating the problem which would be faced in a trial of this case we make the very conservative assumption that each car owner in the affected counties purchases 15 gallons of gas once a week. Based upon this assumption we calculate the number of individual gasoline purchases by owners of vehicles in Fresno and Madera Counties at 10,175,000. How many purchases, probably in the millions, made by tourists we can only speculate. Since the price differential occasioned by the acts of the conspirators is 2 cents we find that the loss suffered in each transaction approximates 30 cents. If, as in *Daar, supra,* this loss could be allocated to a single defendant, the task might not be insuperable.

But such is not the case. We must then determine which defendant is liable. Discovery proceedings indicate that there were 108 members of the

defendant Automotive Service Dealers Association. It would be most unlikely that all of the members participated in the conspiratorial activities of the organization and liability may not attach from mere membership. As stated in the Report of the Attorney General's National Committee to Study Antitrust Laws (1955) page 42: "No court has yet held membership in a trade association, whose officers conspire with some members to violate the antitrust law, is by itself conclusive evidence of participation by *all members* of such illegal acts. Such insistence on proof of participation by particular members in conspiratorial action of other members should avoid blanket findings based on mere 'guilt by membership.' "

But even if we have established that the gasoline was purchased from one of the members of the conspiracy we are confronted with the well known fact that very frequently service stations give trading stamps, drinking glasses, etc., all of which have a monetary value and would serve to reduce the two-cent margin on the increased price. We would also have to ascertain whether the transaction occurred on a day such as Monday when it is customary to give additional trading stamps as a bonus. The proliferation of situations in which the two-cent increase would have to be examined to determine whether it truly reflected an increase of two cents is virtually endless.

The problem becomes even more complicated if the purchase is made from service stations which were not a party to the conspiracy. Plaintiffs have alleged that they are entitled to recover from those service stations who were not a part of any conspiracy involving any price increase. As stated by plaintiffs in their second amended complaint they seek to recover ". . . from other service stations at which the price of gasoline was affected by the acts hereinafter complained of." We are not told how this is to be done. Presumably the defendants ultimately found liable would have to pay the excess charges made by nondefendant service station operators, once such overcharges, if any, were ascertained.

It is not disputed that there are over 1,000 service stations located in Fresno and Madera Counties. As we have noted, it appears that 108 of these service station owners were members of the Automotive Service Dealers Association, approximately 12 of whom were served. This leaves a potential of over 900 service stations who sold gasoline during the period in question. As to each of these purchases evidence would have to be received as to whether the actions of the defendants caused any increase in the prices, and if they did, the amount of such increases, whether such increases were offset in whole or in part by the giving of trading stamps or other things of value, and a multitude of other

evidentiary determinations, on purchases numbering in the millions, with the vast majority involving purchases in which the overcharges could not exceed 30 cents. When we inquired of plaintiffs' counsel during oral argument of the effect upon individual service station owners innocent of any wrongdoing of being required to furnish an accounting of their sales during the period in question and the possibly onerous costs that such a procedure would entail we were not satisfied with the answer that this was just a burden that a citizen would have to assume in the furtherance of justice just as jury duty might require. Common sense tells us that such an accounting would be a serious problem for a well-ordered, computerized organization. When applied to an independent service station owner operating on a "shoe string" it would be problematic whether he could survive. In this connection it cannot be disputed from universal observation that service stations are most frequently operated in part by part-time help by school boys, that service stations have a financial mortality rate exceeded only by restaurants. We do not believe that a class action otherwise meritorious should be an instrument of financial destruction for innocent merchandisers. Even at the pleading and discovery stage the costs incurred would be enormous.

We have heretofore noted the uniqueness of this case in that it is a suit on behalf of a very large class against a large class. Unlike a suit against a single defendant where there is at least one common denominator we have here no common denominator as each defendant has the potential of having a different relationship to the plaintiffs with whom he dealt than did another defendant. ■ In effect, we have the potential of having the interaction of 1,000 defendants with 265,000 plaintiffs or a total possible involvement of 265,000,000 transactions. We realize, of course, that it is not realistic to believe that each plaintiff bought gasoline from each defendant but it is equally unrealistic to believe that many plaintiffs did not have dealings with many different defendants and nondefendants under a variety of different contractual arrangements.

We are particularly puzzled as to how plaintiffs would go about proving that a service station owner, innocent of any participation in any conspiracy to raise prices nevertheless raised his prices because the alleged conspirators raised their prices. Such an inquiry would require the trial court to probe the state of mind of hundreds of service station owners to determine what their motivation was in raising their prices of gasoline. The problem appears to us to be one of Herculean proportions, staggering in the amount of trial time required of the courts and even more gargantuan in costs to the litigants and even to innocent service station owners. Nor are we told

how overcharges of nondefendants would be prorated and collected from the defendants.

We have devoted considerable discussion to a consideration of the practical problems which would be generated in the prosecution of the class action suit we have before us. We do so because we believe that in determining the propriety of a class action and the fundamental need for the ascertainment whether a suitable class with a cognizable community of interest in the litigation exists we must, under the unusual circumstances of this case, determine whether there is an ascertainable class of defendants in whose contractual relationship with the plaintiffs there is a manageable community of interests. We do not believe that there is.

Decisions of our courts have recognized the imperative that a class action must be viewed in the light of the problems its institution creates for the courts. The case of *Stilson* v. *Reader's Digest Assn., Inc.*, 28 Cal. App.3d 270 [104 Cal.Rptr. 581] recognizes these practicalities. The language in *Stilson, supra,* seems entirely applicable to this case. "To open a California court to the presentation of such evidence by an indeterminable portion of the 21 to 50 million unnamed plaintiffs would foist upon our judicial system an intolerable burden, and the mere nominal damages to be recovered by even a large number cannot warrant such an imposition.

"  .    .    .    .    .    .    .    .    .    .    .    .    .    .

"We note that the trend of authority favorable to class actions (*Vasquez* v. *Superior Court, supra; Daar* v. *Yellow Cab Co., supra*) does not vest an uncontrolled discretion in the named plaintiffs and their counsel to represent a class of unlimited size (see *Diamond* v. *General Motors Corp.,* 20 Cal.App.3d 374 . . .; *Los Angeles Fire & Police Protective League* v. *Rodgers,* 7 Cal.App.3d 419 . . .). Rather, as pointed out in *Daar* and *Vasquez,* there must be some benefit of substance to the parties and the court.

"Although an award of but nominal damages to each of the millions of unnamed plaintiffs would impose a heavy penalty upon defendants, it would hardly serve the interest of any plaintiff. Yet to award even slightly more than nominal damages, the court would be required to examine the mental and subjective state of each of the millions of plaintiffs, since in each case such individual appraisal is of the essence of the claim for damages, and, indeed, of the cause of action." (28 Cal.App.3d at p. 274.) (See also *Bozaich* v. *State of California,* 32 Cal.App.3d 688, 695 [108 Cal.Rptr. 392].)

Although in the instant case we do not have millions of plaintiffs, our problem is compounded by the interplay between a minimum of 265,000 plaintiffs with a thousand defendants and all that was said in *Stilson* applies in the instant case, including the immense amount of court and litigant time involved to collect essentially nominal damages. If an individual plaintiff purchased 15 gallons of gas a week for the entire period of time of the alleged conspiracy his general damages would be approximately $10.

We have not discussed other points raised by the litigants. If our premise is correct that the entire litigation cannot withstand the challenge that no ascertainable class of manageable proportions exists the action pleaded must fail irrespective of all other contentions, and whatever we might say on other points would be purely dicta.[1] Likewise if we correctly ascertain from the pleadings that this type of class action cannot be countenanced by the court, no amendment of the complaint can cure the deficiency. Moreover, as we noted earlier, plaintiffs have by their actions indicated that they do not wish to amend their complaint, contenting themselves to let it stand or fall in its present state.

The judgment of dismissal is affirmed.

Brown (G. A.), P. J., and Gargano, J., concurred.

A petition for a rehearing was denied December 11, 1973.

---

[1]Both plaintiffs and defendants have cited the case of *Eisen* v. *Carlisle & Jacquelin*, 479 F.2d 1005 in support of their respective claims, the plaintiffs when the trial court decided the case favorably for them, the defendants when the Second Circuit Court of Appeals reversed the trial court with a decision devastating to plaintiffs' contentions. The *Eisen* case involves a suit by a class of sellers of stock in odd lot sales on the New York Stock Exchange against the stock brokers, the contention being made that such sellers were damaged in the amount of $60,000,000 by the differential charged for an odd lot sale as against the normal sale of entire shares. Neither citation is now of moment because the United States Supreme Court has not only granted certiorari but has directed counsel to brief the case particularly with a view to the impingement of class actions on constitutional issues, such issues as "fluid recovery" (which the Second Circuit's decision found unconstitutional), the minimal notice to class members which would satisfy due process requirements, etc.