## Lieberman v. Howard Johnson's, Inc. (No. 3)

*Steven M. Feldman,* for plaintiff.

*Gerry J. Elman,* Deputy Attorney General, for Commonwealth of Pennsylvania, intervening plaintiff.

*Richard E. McDevitt,* for defendant Howard Johnson's, Inc.

*Edward I. Swichar,* for defendant Atlantic Richfield Co.

*Benjamin M. Quigg, Jr.,* for defendant Exxon Corp.

*Hoyt H. Harmon* and *Arthur L. Vangeli,* for defendant Gulf Oil Corp.

ANDERSON, J., July 16, 1974.—The above-captioned case is a class action brought by an individual user of the Pennsylvania Turnpike, on his own behalf and on behalf of all others who have in the past or will in the future purchase food, gasoline, motor fuel and

motor oils from defendants, Howard Johnson's, Inc., Atlantic Richfield Company, Exxon Corporation (formerly Humble Oil & Refining Company) and Gulf Oil Corporation. By an order dated June 29, 1973, the Commonwealth of Pennsylvania was permitted to intervene in this action as a party-plaintiff. The complaint in equity alleges that defendants have charged and continue to charge prices for their goods and services at their turnpike establishments in excess of the retail prices prevailing at off-turnpike businesses in the vicinity of those establishments, thus breaching their respective contracts with the Pennsylvania Turnpike Commission. Plaintiffs have asked for injunctive relief as well as monetary damages. Defendants filed preliminary objections to the Lieberman complaint. In an opinion and order dated June 29, 1973, this court held, inter alia, that plaintiff and the class which he purports to represent have standing to sue as third-party beneficiaries of the contracts between the Turnpike Commission and defendants. The court reserved judgment on whether the suit was maintainable as a class action under Pennsylvania Rule of Civil Procedure 2230, which provides:

"Rule 2230. Class Actions

"(a) If persons constituting a class are so numerous as to make it impracticable to join all as parties, any one or more of them who will adequately represent the interest of all may sue or be sued on behalf of all, but the judgment entered in such action shall not impose personal liability upon anyone not a party thereto.

"(b) An action brought on behalf of a class shall not be dismissed, discontinued, or compromised nor shall a voluntary nonsuit be entered therein without the approval of the court in which the action is pending." Adopted June 7, 1940. Eff. Feb. 5, 1941.

The note to subsection (a) provides, in pertinent part:

"Note: This subdivision adopts the practice under Pennsylvania equity rule 16 and F. R. C. P. No. 23(a) [28 U.S.C.A.] in providing for a class suit where the members of a class are so numerous as to make it impractical to join all parties."

Recently, in McMonagle v. Allstate Insurance Company, 227 Pa. Superior Ct. 205 (1974), the majority of the members of our Superior Court expressed the view that Pennsylvania courts should give persuasive effect to the Federal law under the present Rule 23, even though it was substantially changed in 1966. Therefore, we look to Rule 23 and Federal class action cases decided thereunder for guidance in deciding whether the instant action should be permitted to proceed as a class action. Rule 23 provides:

"Rule 23. Class Actions

"*(a) Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

"*(b) Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which

would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

"(c) *Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions.*

"(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be condi-

tional, and may be altered or amended before the decision on the merits.

"(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

"(3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class.

"(4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.

"(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair

conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

"*(e) Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." As amended February 28, 1966, effective July 1, 1966.

In order for the court to properly decide whether to permit this litigation to proceed as a class action, we ordered plaintiffs and defendants to file memoranda of law and fact with reference to legal authority and factual documentation concerning:

(a) The approximate size of the class which he seeks to represent and how that size was determined;

(b) How many of these persons can be identified through reasonable efforts;

(c) How identified class members are to be notified at each point in the progress of this litigation;

(d) How members who are not capable of identification are to be notified at each point in the progress of this litigation;

(e) The approximate costs of notice and communi-

cations; and who should initially bear the costs of same;

(f) The specific items or products and services involved in the alleged overcharges;

(g) How the plaintiff intends to prove the alleged overcharges, and problems in connection therewith;

(h) An approximation of how much in damages might reasonably be expected to be proved in relation to the class as a whole;

(i) An approximation of the number of members of the class who would be expected to file claims;

(j) An approximation of how much in damages would be expected to be proved by the class members who file claims;

(k) If damages are computed on a class level, and if a lesser sum is actually claimed by class members, how the residue is to be dealt with;

(l) An itemization of the costs which the plaintiff can reasonably be expected to incur, including attorney fees and the costs of notice;

(m) How inquiries from, and communications with members of the class would be handled;

(n) Whether subclasses should be established and the potential membership of each recommended subclass;

(o) If there are subclasses established, whether the cause of action against the various defendants should be severed in any way.

The questions propounded by the court relate to manageability, and are directed at four main areas of inquiry:

(1) the size of the class; (2) the form of notice to the class; (3) how damages are to be calculated and distributed; (4) the likelihood that members of the class will actually recover alleged damages.

Plaintiffs in their memorandum were not able to

estimate the size of the class with any degree of accuracy. However, plaintiffs cited statistics supplied by the Turnpike Commission which indicate that from July 1966 to June 1972 over 300,000,000 vehicles used the turnpike. Turnpike statistics neither reveal if single vehicles have made multiple trips, thus reducing the 300,000,000 figure, or if those vehicles carried passengers, thereby increasing the figure. Similarly, there is no way of determining how many patrons were served from the volume or dollar sales of the defendants.

We do know, however, that during the six year period approximately 279,187,000 gallons of gasoline alone were sold by the oil company defendants. An Exxon employe estimated that the average turnpike gasoline purchase was 11.5 gallons. That would mean that there were approximately 24,277,000 gasoline purchases during the six years. For the same period, it is estimated that there were 70 million sales transactions at the 26 restaurants on the turnpike, with gross receipts totalling $83,608,000. From these large figures, indicating that there were millions of transactions at defendants' turnpike facilities, it must be concluded that the purchasers of food and automotive goods and services likewise number in the millions.

From the outset of the hearings in this matter, this court recognized that allowing this suit to proceed as a class action on behalf of such an immense group of people might pose serious constitutional problems with reference to notice, and proof and distribution of damages; and might prove unduly burdensome for the court. However, because we are cognizant of the importance of consumer class actions, we deemed it necessary to afford plaintiffs every opportunity to suggest means of going forth with this action which would comport with the requirements of due process.

After careful and serious analysis of plaintiffs' and defendants' memoranda of fact and law, we find we must agree with defendants that plaintiffs' proposals do not satisfy that criterion.

## IDENTIFICATION AND NOTICE TO THE CLASS

The threshold issue that plaintiffs had to resolve was how to identify the users of turnpike facilities so that they can be given notice of the pendency of the action.

In its affirmance of the Second Circuit Court of Appeals decision dismissing a class action on behalf of over two million odd-lot stock purchasers, the United States Supreme Court in Eisen v. Carlisle & Jacquelin, 417 U. S. 156, 40 L. Ed. 2d 732 (1974), made clear that notice in a class action must be designed to fulfill the requirements of due process. That is, " '. . . [t]he means employed must be such as one desirious of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is itself reasonably certain to inform those affected' ": Id. at 746-47, citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 315, 94 L. Ed. 865, 874 (1950).

The Supreme Court held that under Rule 23(c)(2) individual notice must be sent to all class members who can be identified with reasonable effort: Id. at 748.

Proper notice is no less important in this proposed class action than it would be in an individual action. Since a judgment or settlement of the class action would bind absent class members, thereby divesting those who do not opt out of their right to sue individually, it would be a gross denial of justice to allow the action to proceed without assuring so far as prac-

ticable that those persons who will have their rights determined, will be given an opportunity to opt out, present evidence and file claims.

In the instant action, it appears that approximately two-thirds of the purchases of automotive products on the turnpike were cash transactions, and that all of the purchases of food were cash sales. Obviously, there is no way to identify and notify individually these cash customers.

Plaintiffs have indicated that Exxon and Gulf have records of individual credit card transactions. Exxon, however, has asserted that the expense involved in retrieving their own records would be in excess of $2.2 million and would require the labor of 270 persons for a period of one year.

All parties agree that the identity of credit card users cannot be ascertained by the expenditure of "reasonable effort," and, therefore, that no member of the proposed class (outside of plaintiffs themselves) is capable of identification and individual notification.

In recognition of this fact, plaintiffs have submitted a proposal for notice by publication which would include:

(1) Posting of notice at all entrances and exits of the Pennsylvania Turnpike and in all restaurants and service areas located on the Pennsylvania Turnpike.

(2) Sending of notices to various automobile clubs with a request that they forward the notice to their members.

(3) Sending of notices to various trucking associations with a request that they forward the notice to their members.

(4) Publication of notices in various selected newspapers in Pennsylvania and in certain adjoining States such as New York, New Jersey, Ohio and West Virginia whose residents may be users of the turnpike.

(5) Issuance of news releases to various radio and television stations in Pennsylvania and various adjoining States with a request that they broadcast the release as a public service announcement.

Plaintiffs' proposals for notice are not adequate because they are not "reasonably certain to inform those affected." Placards (14 inches by 11 inches as proposed by plaintiffs), at turnpike entrances and exits would not be readily decipherable by persons in motor vehicles and would serve little purpose. Similar notices, posted in adequate numbers, at gas stations and restaurants would provide some notice to future users of turnpike facilities, but would not assure notice to past users.

Plaintiffs did not indicate how many auto clubs and trucking associations exist or how many persons could be notified through such organizations. Moreover, while plaintiffs propose that the notices be supplied to the clubs and associations, no provision is made for distribution of the notices to members except to "request" that such distribution be made. Reliance on the good-will of others to provide notification to the class is completely lacking in certainty and is not to be countenanced.

Radio, television and newspaper advertisements would provide an excellent means of reaching a great number of class members. Again, however, plaintiffs' proposal is inadequate. The Turnpike Commission estimates that approximately 50 percent of the vehicles using the turnpike are from out-of-State. We can well imagine that travellers from all 50 states as well as from Canada and Mexico and other foreign countries have used and will use the turnpike. Plaintiffs, however, propose only ads in newspapers in Pennsylvania, New Jersey, New York, Ohio and West Virginia. Such limited printed notice could not pos-

sibly serve to apprise interested parties in other areas of the pendency of the action. Even if the proposed class were limited to residents of those five States or Pennsylvania alone, publication in "various selected newspapers" will not satisfy the requirements of due process. While the extent of notice by publication could conceivably be limited in a proper case, here the class members are so amorphous that publication of the widest, practicable extent is required. To reach the class members, we think that notice need be placed in every daily newspaper of general circulation in the United States and that the advertisements be such that they would be likely to attract the attention of the average reader. Such an ad would have to be large and prominently placed, and one such as "a legal notice in the Philadelphia Bulletin [at] $1.67 per line . . ." [1] simply will not suffice.

Similarly, while radio and television are excellent media for the dissemination of notice, the advertisements would have to be widespread, in prime time, and could not be limited to a few public service announcements. Moreover, as we said above, plaintiffs cannot be permitted to base their proposals for notice on the possibility of the gratuitous cooperation of others.

In concluding that the widespread notice as set forth above is required, we are especially mindful of the potentially serious consequences inherent in approving inadequate notice. In Greenfield v. Villager Industries, Inc., 483 F. 2d 824 (3d Cir., 1973), rehear.

---

[1] Defendants have indicated that one-eighth page notices in the news and sports sections of the New York Times for three days would cost $8,082. Similar ads in the Philadelphia Evening Bulletin would cost $4,983.30; while the charge to place the notice in one section of the Wall Street Journal, National Edition three times would be $8,410.58.

denied, registered owners of corporate stock brought a class action against the corporation and certain of its officers, directors and other shareholders, alleging violations of Federal securities laws. The Court of Appeals overturned a settlement approved by the District Court, which had already been distributed, because although many of the class members were identifiable and could have been notified individually, the only notice of the proposed settlement actually given was by publication in the Wall Street Journal and The Philadelphia Evening Bulletin on two occasions seven days apart during the East Coast summer vacation period. The court held that:

"This was insufficient notice under any standard of fairness, justice, or due process; it flew in the face of the specific terms of 'the best notice practicable' rule; it contravened plaintiffs' stated representation to use individual notice insofar as possible; and it constituted such a defect to the proceedings in the district court that we will not only reverse the district court's orders relating to appellants' requests for extension of time, but we will also vacate the order approving the class action settlement and all orders implementing the settlement": Id. at 830-31.

Citing Mullane v. Central Hanover Bank & Trust Co., supra, the court further said that "constitutionally mandated notice which is inadequate under the circumstances may be as fatal to due process as no notice at all. Moreover, pro forma gestures will not suffice": Id. at 834.

We think that in the instant case, plaintiffs' proposals for notice amount to mere "pro forma gestures."

Another problem arises with respect to who must bear the cost of notice. In their memorandum, plaintiffs assert that "the cost of notice should be borne

initially by the defendants." However, in Eisen v. Carlisle & Jacquelin, supra, the Supreme Court held that in a class action where an adversarial relationship between the parties exists, "the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit": 40 L. Ed. 2d at 749. The court thereafter ordered that the action as defined be remanded and dismissed because the class representative had consistently maintained that he would not bear the costs of notice.

In the instant case, even though much of the notice proposed by plaintiffs is not costly, they have given no indication that they would be willing to pay even those minimal amounts, let alone bear the expense of individual notice[2] or extensive notice by publication.

Clearly, none of plaintiffs' proposals relating to notice are adequate to support the maintenance of a class action.

## PROOF AND DISTRIBUTION OF DAMAGES

We turn now to plaintiffs' proposals for proof and distribution of damages. It must be stressed initially that in determining whether a class action can be

---

[2] Plaintiffs have tentatively suggested that the oil companies could send notice in their next mailing to their credit card holders. That method would assure notice to all credit-card holders who have used the turnpike in the past and have not relinquished their accounts. However, printing and handling notice forms for all holders of defendant oil companies' credit cards throughout the United States would undoubtedly be expensive. Moreover, Exxon estimates that it would cost approximately $500,000 for a single mailing to its credit card holders who would not be billed in a particular month.

While this method would provide individual notice to a large number of class members, in view of plaintiffs' determination not to bear the cost of notice, this suggestion cannot be considered in evaluating the sufficiency of plaintiffs' proposals for notice.

maintained, we are precluded from inquiring into the merits of plaintiffs' case: Eisen v. Carlisle & Jacquelin, 40 L. Ed. 2d at 749. Although we have already held that in the instant case a cause of action exists, that factor is not relevant to class action certification, nor is the likelihood that plaintiff can actually prove his claims. However, we can examine the methods of proof that plaintiff proposes insofar as they present problems of constitutionality, complexity on a class basis as opposed to an individual basis, and the expenditure of judicial resources. See Boshes v. General Motors Corporation, 59 F. R. D. 589 (N.D. Ill. 1973).

Plaintiff has proposed that the principle of "fluid class recovery" be utilized to prove his claims. In the context of this case, such a recovery would involve a determination of damages at the class level, that is, by computation of total overcharges, with recoveries to class members who can prove their damages, the remainder to be distributed to or be used for the benefit of the class as a whole. Plaintiffs suggest that any residue might be used to reduce gasoline prices on the turnpike or to reduce tolls.

Much of the support for the fluid class recovery came from the Second Judicial Circuit. However, the Court of Appeals for the Second Circuit in Eisen v. Carlisle & Jacquelin, 479 F. 2d 1005, 1018 (1973), emphatically held that the fluid class recovery procedure constituted "an unconstitutional violation of the requirement of due process of law." The Supreme Court, in affirming the decision of the Court of Appeals, did not consider the issue: 40 L. Ed. 2d at 745-46, n. 10.

We agree with defendants that the fluid class recovery cannot be used in the instant action to distribute damages. Because the class of persons using the turnpike is constantly changing, benefits conferred

on future users might deny past users a share in the recovery, or confer on others more or less than they are entitled; and would bestow to first-time users a benefit to which they are not entitled. As defendant Atlantic Richfield succinctly put it: "The law neither obligates the defendants to pay over their property to persons they have not injured nor to pay those they have injured more than the amount of their damages." Therefore, even if a formula for recovery could be derived which would establish an upper limit of liability (see Yanai v. Frito Lay, Inc., 61 F. R. D. 349, 352 (N.D. Ohio 1973)), individual damages must eventually be proved and any excess must be returned to defendants: B & B Investment Club v. Kleinert's Inc., 62 F. R. D. 140 (E.D. Pa., 1974); Feder v. Harrington, 58 F. R. D. 171 (S.D.N.Y., 1972).

An evaluation of plaintiffs' memorandum leads to the conclusion that it is unlikely that any such formula can be derived.

Plaintiffs give no information at all concerning the proof of food overcharges except to say that "defendant Howard Johnson's charges more per pound for its hamburger on the turnpike than it does off the turnpike." No information is given concerning how plaintiffs propose to compare quality of food, size of portions, type of service and decor.

Howard Johnson's has indicated that the 26 restaurants it operates on the turnpike vary in size and type of service offered. Fifteen are combination dining room, counter operations; eight offer only counter service; two are combination cafeteria, snack bars; and one is a combination dining room, snack bar and cafeteria. Though menus at all these facilities are nearly identical, they change about four times per year.

While comparing the food at turnpike Howard

Johnson's restaurants with food at off-turnpike Howard Johnson's establishments appears to be the most satisfactory method of proving the overcharges, plaintiffs do not indicate that they intend to do that, nor do they indicate whether there are sufficient Howard Johnson's restaurants in the vicinity of the turnpike to make this feasible. Moreover, plaintiffs failed to list the specific items of food which are objects of the alleged overcharges, as was ordered by the court. If plaintiffs could not, or would not even provide the requested enumeration, it is difficult to see how they expect to prove their claims.[3] Not only would plaintiffs have to show that excessive prices were charged on hundreds or perhaps thousands of items at 26 locations over a period of six years,[4] but each class member would be required to present evidence of each purchase, including the date and location. Such a procedure would be entirely unmanageable. See Weit v. Continental Illinois National Bank and Trust Company of Chicago, 60 F. R. D. 5 (N.D. Ill., 1973).

With respect to gasoline prices, the situation is not much better. Plaintiffs presently have monthly volume sales of the defendant oil companies for each of their service stations on the turnpike. The prices charged by these defendants were uniform and changed infrequently. Thus, the prices charged by the oil companies for gasoline on the turnpike is readily ascertainable. However, as set forth by plaintiffs themselves: "The prices charged off the turnpike undoubtedly fluctuated more than those on the turnpike, and undoubtedly varied from station to station." Plaintiffs hope to rely

---

[3] Similarly, plaintiffs failed to deal with any automotive product sold by the gas companies except gasoline.

[4] Howard Johnson's, Inc., indicates that a given menu will list approximately 400 separate items for sale.

on quarterly surveys of off-turnpike stations conducted by Gulf and Exxon (but not Atlantic Richfield). One survey of the Gulf Brandywine station is cited by plaintiffs. That survey shows that there are 14 off-turnpike gas stations in the vicinity. One station sold gas at the same price as the turnpike establishment, while the other 13 charged prices for regular gasoline which were from one to six cents less.

We are unable to comprehend how a formula for calculating overcharges at the Brandywine station for the survey period is to be derived from such information, let alone how such a calculation is to be related to alleged overcharges at other stations. The calculation of medium and mean costs would result in different rates of overcharge. If the highest off-turnpike price were used as a base, no overcharge would be established at all. Furthermore, as with the food, each person who had bought gasoline would be required to present evidence of damages.

The United States District Court for the Northern District of Illinois was faced with a not dissimilar situation in Boshes v. General Motors Corporation, 59 F. R. D. 589 (N.D. Ill., 1973). In that case, plaintiff sought certification of a class involving between 30 and 40 million purchasers of General Motors automobiles between 1965 and 1968, alleging violations of anti-trust laws. In denying class certification, the court said:

"Although plaintiffs might prove monopolization and price-fixing, they must also prove that they suffered damages and, with some reasonable degree of certainty, the extent of the damages.

". . .

"[T]he complexities of individual proof of damages in this case are overwhelming.

". . .

" [T] here does not appear to be any way to rationally and fairly distribute any damage 'fund', assuming a violation by GM could be proved.

"No workable formula has been suggested": Id. at 600.

A similar set of facts was presented in Ralston v. Volkswagenwerk, A.G., 61 F. R. D. 427 (W.D. Mo., 1973). Plaintiff brought a class action on behalf of approximately 4.5 million purchasers of new Volkswagens, alleging a conspiracy on the part of the manufacturer, importer, distributor and dealers to maintain artificially inflated prices. District Judge Urbom analyzed testimony relating to proof of the existence of a "free market price" for Volkswagens and concluded:

"I can find nothing to indicate that Rule 23 has abrogated the traditional means of measuring individual damages. If damages were to be awarded in this action, they should not be based on speculation or a system of averaging. Rather, the compensation due each individual member of the class must necessarily reflect the damages actually suffered by that party": Id. at 432-33.

The court in Boshes, supra, recognized the impossibility of managing a class of millions of persons:

"It would place an impossible burden upon any court to provide adequate notice to a proposed class of this size and thereafter to attempt to assemble and classify the transactional material required to identify the particular interest of millions of purchasers over this span of years. The mere prospect of these clerical and administrative problems would be enough to justify a determination of unmanageability": Id., 59 F. R. D. at 599-600.

In Ralston, supra, the court considered manage-

ability specifically in terms of the requirement of individual proof:

"A recognition that each member of the class would have a right to come into court and give evidence raises staggering problems of logistics. Manageability could not be assured, or even predicted. To afford manageability by impinging upon substantial rights— or duties—to present individualized evidence is not an acceptable goal of a class action": Id., 61 F. R. D. at 433.

The court's conclusion in Ralston that the action was unmanageable is especially significant in view of the fact that this court also believes that reliance on a fluid class recovery to distribute damages is unlawful, and that each consumer must present evidence of his actual damages.

Several other courts which have been asked to certify class actions involving potentially millions of consumers have held such actions to be unmanageable. In Hackett v. General Host Corp., Civil No. 70-364 (E.D. Pa., 1970) unreported, the District Court refused to permit the maintenance of a class action by a retail consumer of bread on her own behalf and on behalf of some 6 million consumers in the Philadelphia area, alleging that seven bread bakeries had violated the Sherman Act. Upon review, the ruling was held to be an unappealable interlocutory order: 455 F. 2d 618 (3d Cir., 1972), cert. denied 407 U. S. 925, 32 L. Ed. 2d 812 (1972). In United Egg Producers v. Bauer International Corp., 312 F. Supp. 319 (S.D.N.Y., 1970), class action certification was denied in a suit on behalf of all consumers of eggs in the United States.

In City of Philadelphia v. American Oil Company, 53 F. R. D. 45 (D.N.J., 1971), private anti-trust class actions were brought against gasoline companies by a taxi company, a contractor, the City of Philadelphia

and the State of New Jersey. The court held that while the class actions could be maintained on behalf of 550 taxi companies in Pennsylvania, New Jersey and Delaware, 10,000 bulk purchasers in the tri-state area, and the City of Philadelphia and State of New Jersey on behalf of governmental units and bulk purchasers; a class action on behalf of approximately 6 million retail consumers in the three States was unmanageable. Likewise in Hawaii v. Standard Oil Company, Civil No. 2826 (D. Hawaii, 1969) unreported, affirmed 405 U. S. 251, 31 L. Ed. 2d 184 (1972), class action status was denied in a suit brought on behalf of every individual purchaser of gasoline in the State of Hawaii. See also Devidian v. Automotive Service Dealers Association, 35 Cal. App. 3d 978, 111 Cal. Rptr. 228 (1973); contra, Appleton Electric Company v. Advance-United Expressways, 494 F. 2d 126 (7th Cir., 1974), in which a class action on behalf of several million shippers to recover overcharges from 1400 motor carrier defendants was permitted where the rate of overcharge and refund requirements were set forth in an Interstate Commerce Commission order.

In McMonagle v. Allstate Insurance Co., 227 Pa. Superior Ct. 205 (1974), our Superior Court affirmed, per curiam, the dismissal of a class action brought in the Court of Common Pleas of Allegheny County on behalf of all Pennsylvania holders of Allstate Insurance Company policies who were not reimbursed under the automobile medical payments provisions of Allstate's policies after an uninsured motorist award was rendered in favor of each respective insured.

Although class membership was estimated only to be in excess of 500 persons, Superior Court held that the lower court had not abused its discretion in concluding that " '[t]here would be a great expenditure of time, effort and expense to have all the claims

disposed of in Allegheny County, not only for the claimants and attorneys but for this court. The claims can be handled more efficiently and with less expense in the respective judicial district' ": Id. at 209.

The complexity and difficulty foreseen in managing the instant case is virtually beyond comparison with the limited problems which could be anticipated in McMonagle. Therefore, it would be no abuse of discretion on our part to hold that the expenditure of judicial resources that would be involved in the litigation of this action would alone render it unmanageable.

Judge Hoffman, dissenting in McMonagle declared:

"Following the federal practice, Pa. R.C.P. 2230 should likewise yield liberal construction and application. While the court may, in appropriate circumstances, weigh the maintainability of the class action against such considerations as judicial economy and efficient administration, such a balancing test should not frustrate and devitalize a procedural tool by which a group, too numerous to make joinder practicable, seeks to 'redress a common grievance'. This social purpose and the precedential importance of the class action should be paramount to the convenience of our judiciary": Id. at 233.

Applying this balancing formula, we believe that the administrative problems which would be produced in this action, outweigh its "social purpose."

Moreover, Judge Hoffman set forth a criterion for the maintenance of a class action which is especially applicable to this case: "In Pennsylvania, a class action . . . will be maintained only where 'the relief sought by . . . [the class representative] is in its nature beneficial to all those whom he undertakes to represent' ": Id. at 231.

In their memorandum, plaintiffs were unable to approximate the number of members of the class who

would be expected to file claims, but admitted "that the number would be small in relation to the total class." Similarly, while plaintiffs were unable to approximate how much in damages would be expected to be proved by class members who file claims, they stated that "it appears clear to plaintiff that the amount would be small in relationship to the total damages suffered by the class as a whole."

Although plaintiffs' conclusion that few persons would file claims might be based at least in part on the unlikelihood that the notice suggested by them would apprise many persons of the pendency of the action, we think that even if adequate notice by publication were given, relatively few persons would submit claims either because they had no way of ascertaining their damages and proving such; or because their recovery would be too small to be worth the effort.

An action brought on behalf of a class of persons which in the end will benefit few if any of them cannot be maintained.

## CONCLUSION

In our June 29, 1973, opinion we held that: "With the exception of certain questions concerning manageability, the maintenance of this action as a class action is superior to other methods for the efficient resolution of this controversy." (See p. 173 supra.)

After careful consideration of the memoranda submitted, we now hold that the action is unmanageable and not maintainable as a class action because:

(1) The proposals for notice set forth by plaintiffs do not satisfy the requirements of due process;

(2) Plaintiffs do not indicate any willingness to bear the costs of proper notice;

(3) Plaintiffs have not suggested any method for

determining overcharges on food and automotive goods other than gasoline;

(4) Plaintiffs have not suggested an adequate method of proving gasoline overcharges;

(5) Few class members can be expected to benefit from the maintenance of the action;

(6) Maintenance of this suit as a class action would be overwhelmingly burdensome to the court and would neither promote judicial economy nor the efficient administration of justice.

## ORDER

*And now*, July 16, 1974, it is hereby ordered that the preliminary objections of defendants Howard Johnson's Inc., Atlantic Richfield Company, Exxon Corporation and Gulf Oil Corporation to the maintenance of the above captioned case as a class action are sustained, and the case is dismissed without prejudice to the continuance of so much of the claim asserted in the complaints as refers to alleged individual rights of Lieberman and the Commonwealth of Pennsylvania against defendants.